Jeffrey H. SADO, Plaintiff–Intervenor,

v.

Robin ELLIS, et al., Plaintiffs,

v.

Steven ISRAEL, et al., Defendants.

No. 90 Civ. 1634 (RO).

United States District Court,
S.D. New York.

March 19, 1993.

Jeffrey H. Sado, pro se.

Stuart A. Jackson, pro se.

## OPINION AND ORDER

OWEN, District Judge:

This action, involving outdoor advertising signs in Times Square, New York City, was filed as a copyright claim for damages. One Jeffrey Sado thereafter sought and was granted leave to intervene on allegations that by contract he was entitled to a certain portion of the proceeds. However, Sado and his counsel, Stuart Jackson, thereafter had a falling out, and Sado, asserting a need for funds to hire a new lawyer, asked this court to recover for him a certain $5,000 advance payment to Jackson to use to that end.[1] Jackson, asserting he had put in work way beyond the $5,000, declined to return any part thereof. To put things back on track—the action being stalled over this issue—I took jurisdiction of the fee dispute and held a hearing on March 17, 1993 with all principals under oath.

■ The jurisdiction of this court to decide a fee dispute flows from the District Court's supplemental jurisdiction "over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III.... Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties." Judicial Improvements Act of 1990, codified at 28 U.S.C. § 1367. The jurisdiction of a federal court encompasses "a case or controversy in its entirety. Incident to the disposition of the principal issues before it, a court may decide collateral matters necessary to render complete justice." *Jenkins v. Weinshienk*, 670 F.2d 915, 918 (10th Cir. 1982). Determining the legal fees a party to the lawsuit properly before the court owes its attorney with respect to work done in the suit being litigated "easily fits the concept of ancillary jurisdiction." *Id.; See also, Pay Television of Greater New York, Inc. v. Sheridan*, 766 F.2d 92, 94 (2d Cir.1985) ("the decision whether to fix the fees due a withdrawing attorney lies within the discretion of the district court." (citations omitted)); *National Equipment Rental, Ltd. v. Mercury Typesetting Co.*, 323 F.2d 784, 786–87 (2d Cir.1963).

At the hearing, Sado asserted several instances of allegedly egregious conduct by Jackson which he claims warranted their parting. In addition to the fee question, only two require discussion. First, Sado claims that Jackson acted improperly when he without demur gave adversaries a deposition of Sado of April 6, 1989, taken when Sado was without a lawyer. But I have since ruled, on a fully-briefed motion, that no protective order was to be granted with respect to this deposition (Memorandum, November 25, 1992) and that no privilege shielded this deposition from disclosure.

■ Sado next claims that Jackson initially told him that in addition to the contract claim, he would plead a fraud claim on Sado's behalf, but then refused to do so, and that Sado was prejudiced by this refusal. However, on the testimony of Sado and his mother, Sherry Sado, on the record before me, while they put before me various alleged false statements of parties to the commercial relationship along the way, such allegations, even if provable, did not appear to be the basis of a fraud cause of action per se, though they might have evidentiary significance in a contract action, and accordingly I credit attorney Jackson's testimony as to his unwillingness to plead a fraud claim, even assuming that Jackson and Sado originally discussed including such a claim.

■ Finally, Sado claims that he gave Jackson a $5,000 advance to be applied toward costs, and that it should now be returned to him. However, there is nothing to indicate that the fee was anything but a retainer. On the bottom of Sado's $5,000 check (which is to "Cash" for an interesting

---

1. Sado also moved for treble damages pursuant to New York Judiciary Law § 487 (McKinney 1983), based upon Jackson's alleged misconduct. I do not reach this issue.

reason, *see, infra* ), Sado wrote "Stuart Jackson lawyer's fee," and Jackson gave Sado a writing acknowledging that the $5,000 was "toward any legal fees to which we may otherwise be entitled." Jackson testified that the fee was a non-refundable retainer that he required from Sado in order to prove that Sado was serious about and committed to his case. Jackson testified that he initially thought his work in this case would require about twenty-five hours of his time, but that it actually involved many times more because of the difficulties he experienced with Sado and his mother. Both Sados took an active role in pressing on him what the pleadings should include and what legal arguments should be proffered, as indicated by their numerous and lengthy letters to Jackson.

■ Sado endeavors to create an "odor" over the fact that notwithstanding his own agreement to it, the $5,000 payment to Jackson had an unusual wrinkle. It appears that when Sado needed a lawyer here, it was one Jerome Puchkoff who got Jackson for him. While Sado needed a lawyer, Puchkoff, a sometime business venturer with both Sado and Jackson, needed a small loan. Accordingly, Sado, with Jackson's approval, made the Jackson "retainer check" payable to "cash," then went with Puchkoff, cashed the check and gave Puchkoff the $5,000. Jackson immediately credited Sado, in writing, with the payment to him (Jackson) of the $5,000 retainer, Puchkoff thus becoming in effect a borrower of $5,000 from Jackson.[2] Any insinuations of impropriety made by Sado with respect to this transaction lack merit.[3]

Sado next filed a complaint against Jackson with the Disciplinary Committee of the Appellate Division, First Department. When that committee concluded, after a "careful investigation of the allegations," that "there [was] no basis for taking further action," Sado sent the Committee a lengthy letter,

making gratuitous actionable defamatory statements against Jackson.

In sum, on this record I find that Sado's discharge of Jackson was without cause, and that Jackson's withdrawal was in good faith and for cause. Jackson's legal representation achieved Sado's intervention in this case, and I conclude that Sado's charges against Jackson are without basis.

■ I also conclude that the $5,000 was a non-refundable retainer that Sado paid to Jackson, and that Sado is not entitled to its return. In addition, since Sado's discharge of Jackson was, on this record, without cause, and Jackson's withdrawal was for cause, and since on this record Jackson has shown that he expended far more than the anticipated time on Sado's case, Jackson is granted a lien in quantum meruit against any proceeds flowing to Sado, should this occur, from this suit hereafter.[4] *Campagnola v. Mulholland, Minion & Roe,* 76 N.Y.2d 38, 556 N.Y.S.2d 239, 242, 555 N.E.2d 611, 614 (1990); *Fields v. Leeponis,* 95 A.D.2d 822, 463 N.Y.S.2d 864, 866 (2d Dep't 1983).

The foregoing constitute the Court's findings of facts and conclusions of law and are so ordered. The parties are to appear before me in Courtroom 128 on April 2, 1993 at 10:30 a.m. to resolve any open discovery questions and to set a date for trial.

---

**2.** Puchkoff thereafter repaid the $5,000 to Jackson.

**3.** When these issues first surfaced before me, Sado sought an affidavit from Puchkoff, which Puchkoff would not sign, claiming material inaccuracies, whereupon Sado wrongfully threatened him. Sado later apologized.

**4.** I have considered the Sado letter submitted March 18, 1993. Its assertions are, as was discussed in Court at the hearing, based on self-serving letters of the Sados, and do not affect my conclusion that the "facts" the Sados put before me, discussed *supra,* even if established, do not give rise to a fraud cause of action.